[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter is before the court on co-terminus petitions filed by the Commissioner of the Department of Children and Youth Services (DCYS) on June 3, 1991 pursuant to General Status Section 17a-112. Angelo McC. was born on April 5, 1988 in Hartford. The mother of the child is Lisa E., of Fall River, Massachusetts; the father is Angelo McC., last known of Middletown, Rhode Island.
The neglect petition alleges that the child has been abandoned, and, was being denied proper care and attention physically, emotionally, medically, and morally. The termination petition alleges, with respect to both parents, the statutory grounds of abandonment, and no ongoing parent-child relationship. General Statutes Section 17a-112(b)(1) and (4).
Notice And Jurisdiction
The child is currently in the custody of DCYS pursuant to an OTC issued by this court on October 22, 1991. With respect to the pending petitions, the Court (Brenneman, J.), on July 2, 1991, found: "Service Confirmed: mother by certified mail; Service Presumed: father by publication."[1] With respect to the OTC, this court, on November 1, 1991, found: "Service Presumed: mother by certified mail"; on the same date, the OTC was confirmed by agreement.[2] Notice was provided in accordance with statutory law; this court has jurisdiction to hear and adjudicate the instant petitions. General Statutes Sections17a-112, 45a-716, and 45a-717.
Procedure Relative To Co-Terminus Petitions
Where neglect and termination petitions are coterminously filed under Section 17a-112(e) of the General Statutes, the court is required to proceed in three separate stages.
(1) Adjudication of The Neglect Petition
The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since they are predicated on the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition is to be deferred until a decision is rendered on the termination petition.
(2) Adjudication Of the Termination Petition CT Page 6377
The court must next determine whether the proof provides clear and convincing evidence that any pleaded ground exists to terminate the parents' rights, as of the date of filing (or last amendment). If no such ground for termination is found, the court must proceed on the neglect petition and consider an appropriate disposition. However, if at least one alleged ground to terminate is found, the court must move on to the third stage.
(3) Disposition On Both of the Petitions
If grounds have been found to adjudicate the child neglected or uncared for, and to terminate parental rights, applying the respective standards of proof, the court must then consider whether the facts as of the last day of trial establish, by clear and convincing evidence, after consideration of the six factors enumerated in General Statutes Section 17a-112(d), that termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating parental rights, it must return to, and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order should enter terminating parental rights.
Standard of Proof
A fair preponderance of the evidence standard of proof is the proper standard in neglect proceedings. In re Juvenile Appeal (84-AB), 192 Conn. 254, 264 (1984).
With regard to "termination of parental rights", that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except that it shall not affect the right of inheritance of the child or the religious affiliation of the child." General Statutes Section 45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 168 Conn. 421, 430 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651 (1972); In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 671 (1979). The integrity of the family unit is protected by the Ninth Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment
to the United States Constitution. Stanley v. Illinois, supra. "The right to family integrity includes `the most essential and basic aspect of familial privacy — the right of the family to CT Page 6378 remain together without the coercive interferences of the awesome power of the state.'" Duchesne v. Sugarman, 566 F.2d 817, 824
(2d. Cir. 1977); In Re Juvenile Appeal (83-CD), 189 Conn. 276
(1983). Both the child and the parent(s) have constitutionally protected interests in the integrity of the family. Santosky v. Kramer, 455 U.S. 75 (1982). And, the "rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions." See: In Re Juvenile Appeal, 187 Conn. 431, 435 (1982).
The constitutional guarantee of due process of law requires that the statutory ground's) for termination of parental rights by established by "clear and convincing" evidence, not merely a fair preponderance. Santosky v. Kramer, supra. Thus, the standard of proof as mandated by Conn. General Statute Section 17a-112(b) and Prac. Bk. Section 1049 is "clear and convincing" evidence. See: e.g. In Re Juvenile Appeal (84-3),1 Conn. App. 463 (1984).
Termination of parental rights is in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed, or last amended. In Re Juvenile Appeal (84-AB), Supra at p. 262; In Re Nicolina T. 9 Conn. App. 598,602 (1987); In Re Luke G., 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds, may inquiry be made regarding the ultimate best interests of the child. Id. However, since Section 17a-112(b) sets forth the statutory grounds for termination in the disjunctive, one ground only need be established for the granting of the petition. In Re Juvenile Appeal (84-BC), 194 Conn. 252, 258 (1984); In Re Nicolina T., supra.
Factual Findings
The credible evidence and the documentation before the court establishes the following facts. Respondent/mother has five children: George L., d/o/b October 21, 1982; Irona E., d/o/b November 25, 1985; Lacheya E., d/o/b December 25, 1986; Angelo McC., d/o/b April 5, 1988; and, Rachina McC., d/o/b June 6, 1990. As of the date of the filing of these petitions, the maternal grandmother, Clariet L., had custody of two of the children: George L. and Lacheya E. The maternal great-grandmother cared for another child: Irona E. The youngest child, Rachina McC., resided with the mother in Middletown, Rhode Island. Angelo McC. was in foster placement in Connecticut pursuant to an order of the West Hartford Probate Court vesting custody of the child in DCYS. CT Page 6379
On July 1, 1989, respondent/mother brought three children to the maternal grandmother's home in Bloomfield for a picnic: George L., Lacheya E., and Angelo McC. The condition of the children was dirty, hungry, untidy, and unkempt. Respondent/mother left the children informing the grandmother that she would return the following day; she later telephoned stating that she would not be coming back for a few more days. Angelo was ill, was running a low grade fever, and was experiencing repeated episodes of vomiting; on July 4, 1989, the grandmother brought the child to the Mt. Sinai/St. Francis Hospital emergency room. The child was admitted and remained in the hospital from July 4, 1989 to July 14, 1989.
Angelo McC. was fifteen months old when Lisa E. left him with the maternal grandmother three days prior to his admission to St. Francis Hospital; the child was malnourished and developmentally retarded. At fifteen months he was not able to stand, walk at all, and was unsteady in a sitting position; he showed a bone age and overall development at around the nine month level.[3] The child was extremely thin, but quite alert and interactive; he weighted only 15.75 pounds, well under the fifth percentile, and was both weight and growth retarded. Hospital authorities felt the child had not been properly fed and suffered from prolonged, serious physical neglect and malnourishment; DCYS was contacted. While in the hospital the child's social interaction with immediate caretakers was excellent; hospital records repeatedly indicate that the child seemed constantly to be hungry and consumed nourishment "voraciously;" under the care of hospital staff, Angelo gained weight rapidly.
While Angelo McC. was in the hospital, the maternal grandmother, Clariet L., petitioned the West Hartford Probate Court for guardianship/custody of the three children; however, the grandmother had reservations as to caring for Angelo due to his special needs and the commitment that would be required regarding the care of respondent/mother's other two children left on July 1, George L. and Lacheya E. Documents in evidence indicate that Lisa E. conferred with an assigned attorney and expressed an intention to contest the petition in the Probate Court. On or about July 9, 1989, respondent/mother returned to Hartford and undertook to take George L. and Lacheya E. back to Rhode Island. Apparently George L. refused to go, but respondent took Lacheya against the wishes, and despite the pleas, of Clariet L.[4] Lisa E. did not appear at the Probate Court hearing held July 13, 1989; guardianship/custody of George L. and Lacheya E. was placed in the maternal grandmother, Clariet L; temporary custody of Angelo McC., still hospitalized, was granted to DCYS. Apparently, no specialized foster homes were available, and, on July 14, 1989, Angelo McC. was discharged from St. Francis Hospital and placed in the Brown foster home, in Middletown, CT Page 6380 where he has remained, and thrived, to date.[5] An adjourned hearing was conducted in the West Hartford Probate Court on or about November 2, 1989 where it was found that continuation of temporary custody as decreed on July 13, 1989 served the best interest of Angelo McC., who was doing well in foster care; on that date, it was decreed that the custody of Angelo McC. would remain with DCYS, and that the child's maternal grandmother, Clariet L., of Bloomfield be granted "limited visitation rights."[6]
Angelo progressed rapidly in the Brown family foster home. Due to the child's initial condition, a referral was made to DMR Early Intervention Program. In foster care, the child grew and gained weight normally, and was observed to learn very quickly, with appropriate nurturing and stimulation; by the time the DMR assessment was completed in October 1989, the child had learned to sit, walk, and feed himself, and was then functioning on age level in all areas of development.
No expectations were set in the Probate Court; respondent/mother was not present at any of the hearings. The mother was aware of the court order placing temporary custody of Angelo McC. with DCYS; she never contacted the agency until March 15, 1990. During the period, the DCYS worker was unable to locate Lisa E.; although the maternal grandmother had the other two children, the worker was advised that the mother never came to the grandmother's Bloomfield home.[7] At one point, the social worker attempted to reach respondent/mother through a probation officer, but to no avail.
Respondent/mother did not visit at all with Angelo McC. On December 18, 1989, the DCYS worker took the maternal grandmother to visit with the child at the Middletown, Connecticut foster home; by this time the child was thriving in all areas and appeared to be a perfectly normal, healthy little boy. The maternal grandmother indicated she would visit again during Christmas, would provide her own transportation, and would work out the visiting dates and times directly with the foster parent. However, the grandmother did not return, and the worker was informed that there were no telephone calls from her to the child. When the worker inquired of the maternal grandmother regarding her failure to visit and maintain contact with the child, he was told that transportation problems had developed and that she felt "uncomfortable"; the worker again offered to provide transportation. During this period respondent/mother's whereabouts continued substantially unknown and it was reported that she was living in motels. And, as of February 2, 1990, the maternal grandmother had not visited again with Angelo McC.[8]
In mid-February 1990, the DCYS case was transferred CT Page 6381 to another social worker. On or about March 15, 1990, a first communication was received from respondent/mother; the letter stated that the mother had just heard DCYS had custody of Angelo McC. and that she wished to work towards getting the child back.[9]
By letter dated April 6, 1990, the worker informed Lisa E. that she had been the social worker for Angelo McC. since February 1990, that the child is in a two-parent DCYS licensed foster home where he has "made great progress developmentally and . . appears to be happy", and that the mother should contact the worker to make an appointment "to discuss the necessary steps to work towards reunification." On May 16, 1990, respondent/mother telephoned the social worker and an appointment in Hartford was scheduled for June 12, 1990; the worker stated that she would make arrangements to get the mother a bus pass for traveling to and from Hartford, but that it would require a few weeks for Departmental approval. The worker called respondent/mother on June 4 to inform her that she was mailing the bus pass, but mother stated a friend would drive her to Hartford; the social worker asked Lisa E. to call on June 11, and confirm that she would be keeping the 6/12 appointment. Respondent/mother neither telephoned on June 11, nor kept the June 12 appointment.
The social worker next heard from respondent/mother on September 26, 1990; on that date Lisa E. called the DCYS office collect and stated that she was having difficulties where she had been living, and was in the process of obtaining another residence. In that telephone conversation Lisa E. told the social worker that she did not keep the appointment scheduled back on June 12 because she had delivered a child on June 6, 1990 and was afraid to have the worker informed of that pregnancy and the new baby. On September 26, the social worker informed the mother that she would have to make an effort to be in contact with Angelo McC. or the Department would be filing a termination petition.
Nothing was heard from respondent/mother until another collect call was received by the worker on November 7, 1990. Apparently, she had just received the notice of an administrative review (already held) which had been sent to mother's former address, the only one furnished the Department. On 11/7, Lisa E. did inquire as to how the child was, but did not request to visit, ask for a bus pass, or request that DCYS otherwise provide transportation for the mother to visit in Connecticut.
Respondent/mother next telephoned the worker on January 14, 1991, again in response to a notice of an administrative review. Again, she did not request visitation, a bus pass, or the arrangement of other transportation. The Department did not hear from respondent/mother thereafter, and CT Page 6382 these co-terminus petitions were filed June 3, 1991. Respondent/mother appeared at the plea hearing on July 2, 1991, spoke briefly with the worker, but did not request visitation. In her conversations with Lisa E., beginning with the call on May 1990, the worker had always stressed to the mother that steps toward reunification with the child were the obtaining of a stable residence, and visitation to establish a relationship with the little boy. Respondent/mother was never told she could not visit with the child; rather, she was advised that visitation was essential in working towards reunification. Lisa E. has not seen, or visited with, Angelo McC. since she left this child and his two siblings at the maternal grandmother's Bloomfield home on July 1, 1989.
On or about January 23, 1991, the social worker received a call from the maternal grandmother's therapist, Miss Norman; when the worker advised that a termination would quite probably be filed, the therapist stated that the grandmother proposed an aunt, Janet E.; it was agreed that Janet E. would contact the worker, but no word was heard again from either the proposed caretaker or Miss Norman. On the afternoon of January 14, 1991, Fay E., an aunt, called the social worker regarding the review held that morning. Fay E. stated that respondent/mother wished her to attend that morning's review; since the review had been held that morning, the aunt was told the worker would forward a copy of the written review. Termination was questioned, the aunt stating that the maternal grandmother was previously interested in caring for Angelo McC.; the social worker explained that the maternal grandmother had not come forward as a prospective caretaker of this child, and, that since March/April 1990, reunification efforts focused on respondent/mother, Lisa E.
Neither respondent/mother nor the maternal grandmother were ever told by DCYS, or by the foster parent, that they could not visit with Angelo McC. DCYS was willing to facilitate such visitation. The foster mother testified, credibly, that she told the maternal grandmother she was welcome to visit Angelo anytime. The foster parents authorized DCYS to provide the maternal grandmother with their telephone number. The maternal grandmother did call on occasion, spoke with the child, and inquired of the foster parent regarding how the child was doing. Respondent/mother never spoke telephonically with Angelo McC., sent no birthday cards or presents, sent no Christmas cards or presents, and wrote no letters to the child.[11]
Both the foster mother and Dr. Freedman, who conducted the court ordered evaluation, attest to Angelo's being a simply delightful, bright, verbal, articulate child. His physical and developmental progress from July 1989 to the date of CT Page 6383 the psychologist's evaluation is described as "remarkable." The child, after being left off with the maternal grandmother in July 1989 was in a condition of severe physical neglect and substantial developmental delay; according to Dr. Freedman, the child's remarkable recovery, based on his professional experience, was not a typical one.[12] The psychologist testified that he observed a perfectly healthy, verbal, mentally well-developed child; the child's "remarkable" progress was properly attributable to the high quality of care Angelo received in the Brown foster home. The child's psychological parents are Mr. and Mrs. Brown, whom he refers to as his "mommy" and "poppy", and in whose presence he was observed by Dr. Freedman.[13]
According to the psychologist, the child was very verbal, spoke only of the Browns and his activities within their family, and had formed an extremely strong bond with the foster parents. The child also has strong extended family relationships within the members of the Brown household. He refers to Mrs. Brown's sister as "granny", because she is the grandmother figure and he would see that lady with her grandchild. The family consists of older children (one in college) and other foster children; Angelo refers to, and considers, the others his brothers and sister. The Browns are the only family Angelo McC. has ever known; Mr. and Mrs. Brown are the only parents the child has ever known; and, according to Dr. Freedman, the child has no real memories of his biological parents or, at best, only conflicted, negative memories of the biological mother. Any separation of the child from the Browns would be exceedingly traumatic for Angelo McC.
Neither respondent/mother nor respondent/father have had any contact with this child since July 1, 1989. Respondent/father's whereabouts have remained unknown; for much of the period following the leaving of Angelo McC. in Bloomfield on July 1, 1989, respondent/mother's whereabouts were unknown as, by her own testimony, she lived in various motels. The child has had no contact with his biological family except for one visit by the maternal grandmother in December, 1989. Angelo McC. has remained in the Brown foster home continuously since his discharge from St. Francis Hospital on July 14, 1989; Mr. and Mrs. Brown are the child's psychological parents, he has developed remarkably in their loving and nurturing home, the child has bonded strongly with the foster family, and Mr. and Mrs. Brown wish to adopt Angelo McC. should the child become available for adoption.
Adjudication: Neglect Petition
Petitioner is required to prove by a fair preponderance of the evidence that Angelo McC., as of the date of the filing of the co-terminus petitions, was a neglected child in that said child was abandoned (in the common-law sense); or, that said child was being denied proper care and attention physically, CT Page 6384 emotionally, medically, or morally.
The court finds that petitioner has proved, by a fair preponderance of the evidence, that Angelo McC. was, as of the date of filing, a neglected child as pleaded.
With respect to common-law abandonment, respondent/father has had absolutely no contact with this child; his whereabouts have remained unknown, and no communications whatsoever have been received from the father. Respondent/father has, since July 1, 1989, totally absented himself from Angelo McC's life, and has abandoned the child.
Petitioner has also established abandonment, in the common-law sense, as to respondent/mother. The credible evidence established that by the Fall of 1989, respondent/mother was aware that DCYS had custody of this child. Although advised by the first social worker of the November 1989 Probate Court hearing, and urged to attend, respondent/mother did not appear and/or assert any rights to the child. From that point on, respondent/mother did not contact the Department, or inquire of the child until March, 1990. Thereafter, a second social worker assigned to the case of Angelo McC. had telephone conversations with the mother, undertook to discuss visitation and other aspects of reunification with Lisa E., offered to provide bus passes for the mother to come from Rhode Island to Hartford, but yet the mother failed to even visit with Angelo, to send him any letters, holiday gifts or cards. For prolonged periods, respondent/mother did not even notify DCYS of where she resided or how, or through whom, she could be reached respecting the child. There is evidence before the court that Lisa E. did come to Connecticut to see her other two children residing in Bloomfield, but on those occasions she made no effort to arrange any visits with, or to inquire about, her son Angelo McC. Respondent/mother has made no real effort to ever see, or visit with, this child since leaving him with the grandmother on July 1, 1989. In the court's view, petitioner has proved common-law abandonment by the mandated standard, a fair preponderance of the evidence.
Similarly, the evidence preponderates in favor of a finding that this child was denied, as alleged, proper care physically, emotionally, or medically. There is evidence that Angelo McC., when brought to Connecticut, was malnourished, unkempt, and greatly developmentally delayed. The child was described as a toddler who appeared infant sized, who frequently vomited from eating too quickly, and who showed marked growth retardation. The child was fifteen months old; he took nourishment "voraciously" in the hospital and immediately began to gain weight. Testing of the child showed personal-social CT Page 6385 development up to a level of seven months, fine motor-adoptive behavior seven to nine months, language seven to eight months, and gross motor development seven to eight months. The child at fifteen months was considered "very thin", weighed only 15.75 pounds, was unable to stand on his own, and was unsteady while sitting.[14] The extent of the developmental delay was such that mental retardation was considered and the child was referred to Birth-To-Three Program. The suspicion of retardation proved unfounded, the child progressed rapidly with proper nourishment and care in the hospital, and, thereafter, achieved normal developmental levels in excellent foster care. Petitioner has established, by a fair preponderance of the evidence that Angelo McC. had been denied proper care and attention physically, emotionally, and medically, as alleged, prior to his admission to St. Francis Hospital on July 4, 1989.
The court hereby finds, applying a fair preponderance of the evidence standard, that Angelo McC. is a neglected child in that said child has been abandoned; and, in that said child was being denied proper care physically, emotionally, medically or morally; said child is hereby adjudicated a neglected child within the intent and meaning of the Laws of the State of Connecticut, General Statutes Section 46b-120.
Adjudication: Termination of Parental Rights
General Statutes Section 17a-112(b) sets forth the alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must determine that an alleged ground has been established by clear and convincing evidence. As stated previously, the "clear and convincing" burden of proof is constitutionally mandated. Santosky v. Kramer, supra. This evidentiary requirement necessitates a standard of proof that is between the standard required in any ordinary civil action and that required to find guilt; there must be "more than average certainty on the part of the fact finder." In Re Juvenile Appeal (84-3), 189 Conn. 276, 297 (1983); Dacey v. Connecticut Bar Assn., 170 Conn. 520, 536-37 (1976); In Re Juvenile Appeal, 1 Conn. App. 463, 467-68 (1984). As stated heretofore, the co-terminus petitions in this case were filed June 3, 1991.
With respect to both parents, the termination petition alleges as statutory grounds: abandonment General Statutes Section 17a-112(b)(1); and, no ongoing parent-child relationship, General statutes Section 17a-112(b)(4).
a) Abandonment CT Page 6386
General Statutes Section 17a-112(b)(1) reads: "The superior court upon notice and hearing may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . [t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . ."
Respondent/father's whereabouts are, and have remained, unknown, he has had no contact whatsoever with this child since on or before July 1, 1989, and has failed to maintain any reasonable degree of interest, concern or responsibility as to the welfare of Angelo McC. The court finds, applying a clear and convincing evidence standard of proof, that petitioner has established the statutory ground of abandonment with respect to respondent/father.
With regard to respondent/mother, the evidence, and the court's factual findings as discussed in reference to the first ground of neglect, pertain also to this statutory basis for termination: the circumstances of the mother's leaving the child in Bloomfield on July 1, 1989, and not returning; her not having attended the November 1989 Probate Court hearing when urged to do so by the DCYS social worker; Lisa E's not having made any inquiry regarding the child until March 1990; her visiting the other two children in Bloomfield, but never visiting, or undertaking to have any contact with, Angelo McC.; the mother's not notifying DCYS, for prolonged periods of time, of her place of residence, or how, or through whom, she could be reached with regard to Angelo; respondent/mother's failure to visit with the child at all since dropping him off in Bloomfield on July 1, 1989; and, her not having ever undertaken to communicate with the child and her never having sent him any letters, birthday or holiday cards, or any gifts. When the second social worker scheduled an appointment to discuss reunification, and offered to provide the bus pass for the purpose of her traveling to Hartford, respondent/mother did not keep the appointment, did not call, or have someone call, to cancel the appointment, and never bothered to contact the worker with an explanation (or for any other purpose) until over three months later.
Under the circumstances developed through the credible evidence, I cannot conclude that respondent/mother, from July 1, 1989 up to the date of the filing of the termination petition, maintained a reasonable degree of interest, concern or responsibility regarding Angelo McC.'s welfare. The standard respecting statutory abandonment (as opposed to common-law CT Page 6387 abandonment), under Section 17a-112(b)(1), is "not whether the parents have shown some interest in their children", but rather, "[c]ommon sense dictates that a parent's obligations toward . . [a] child go further than a minimal interest." (emphasis in original). In re Rayna M., 13 Conn. App. 23, 37 (1987).
It is hereby found, applying a clear and convincing evidence standard, that petitioner has proved statutory abandonment as a ground for the termination of the parental rights of respondent/mother and respondent/father to the child, Angelo McC.
b) No Ongoing Parent-Child Relationship
General Statutes Section 17a-112(b)(4) provides, in pertinent part, as follows: "The superior court upon hearing and notice . . . may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to a nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of the parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The court agrees with petitioner that the evidence presented, establishes, clearly and convincingly, that there exists no ongoing relationship between either of these parents and the child, Angelo McC. The parents have had no contact with this child since July 1, 1989; there is no evidence to indicate their having met, on a day to day basis, the physical, emotional, moral, and educational needs of this child, which would give rise to any ongoing parent-child relationship(s). As the testimony indicated, Angelo McC. does not know who either of his biological parents are, and he views the Browns, who have cared for him most of his life, as his actual parents.
Appellate decisions in Connecticut have referred to the absence of a parent-child relationship as involving the situation where the child has never known his parent so that no relationship has ever developed, or where the child has clearly lost that relationship so that despite its former existence, it now has been completely displaced; our Supreme Court has stated; "`[i]n either case the ultimate question is whether the child has no present memories or feelings for the natural parent.'" In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645-46 (1980); In re Shannon S., 41 Conn. Sup. 145, 158 (1989). A troubled CT Page 6388 relationship between the parent and child is not a basis for termination of parental rights; In re Juvenile Appeal, 177 Conn. supra at p. 671; In Re Juvenile Appeal (84-6), 2 Conn. App. 705,708-09 (1984); however, in applying the statute, "common sense" is to be utilized and "bizarre results" are to be avoided. In re Juvenile Appeal (84-6), supra at p. 709. Any feelings of the child for the biological parent means feelings of a positive nature. In re James T., 9 Conn. App. 608, 616 (1987); In re Juvenile Appeal (84-6), supra at p. 709; In re Shannon, supra at p. 159.
Here, there was testimony that the child, who is quite verbal, never speaks of his nature parents or of any of his biological relatives. Dr. Freedman testified that there was "almost zero bond", if any, with the natural parents. In Dr. Freedman's view, the likelihood of any memories on the part of the child regarding his natural parents is remote; the child was only fifteen months old when left in Bloomfield, and, at that time, was functioning at only an eight or nine month level. It is the court's assessment that any possible or conceivable day-to-day parent-child relationship which might have existed prior to 7/1/89 has been displaced completely by the day-to-day relationship which has developed between the child and the Browns. Furthermore, it is the opinion of the psychologist, which the court accepts, that any obscure memories which the child might conceivably have with respect to the biological parents would be, given the child's physically deprived condition on July 1, 1989, memories of a "conflicted" or "negative" quality.
The court hereby concludes, applying a clear and convincing evidence standard, that petition has established that there exists no on going parent-child relationship; that is, the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child; between respondent/parents and this child, Angelo McC.
Having concluded the above, the issue remains as to whether the allowance of further time for the establishment or reestablishment of a parent-child relationship, as statutorily defined, would be to the detriment of the child's best interests. In this regard, Dr. Freedman testified, persuasively and credibly, that the Browns are the child's psychological parents, that Angelo's bond with the Browns is exceedingly strong, that the Browns are the only parents the child has ever really known, and that to separate the child from the Browns would be extraordinarily traumatic and simply devastating for this little boy. Neither parent has ever visited the child since July 1, 1989, and neither has made any real effort to do so or to have CT Page 6389 any contact with the child. Since that date (7/1/89), while in the Brown's home, Angelo has received the nurturing and care which has been substantially, if not singularly, accountable for the child's "remarkable" physical and developmental recovery. In the court's view, the evidence clearly and convincingly established that to allow passage of any further time for the possible (though unlikely) development of a parent-child relationship with the biological parents, who have made just minimal, if any, effort to even visit with this child since July 1, 1989, would be entirely inconsistent with Angelo McC.'s best interests.
The court hereby concludes, applying a clear and convincing evidence standard, that to allow further time for the establishment or reestablishment of a parent-child relationship, as statutorily defined, would be detrimental to the best interest of the child.
Disposition
General Statutes 17a-112(b) permits the court to grant a petition to terminate parental rights only upon a determination, based on clear and convincing proof, that to terminate would be in the best interests of the child. Additionally, it is statutorily required that the court consider the six factors set forth in Section 17a-112(d). Evidence was last received in this case on March 6, 1992.[15]
Petitioner, and the child's attorney/GAL, urge termination of parental rights; if the child is freed for adoption, the Department's plan is for this child to be adopted by the current foster parents, the Browns.
Evidence discussed heretofore, and the factual findings set forth previously, have materiality to the dispositional phase of this proceeding. The credible evidence presented, and the inferences to be reasonably drawn therefrom, clearly indicates that termination is in the best interests of this child. As stated, the Browns are the only parents this child has ever really known, and any separation at this point would be psychologically "devastating" for this four year old. Indisputably, the Browns have been excellent parents to Angelo and have provided for all of the child's needs, from the most basic to the most demanding; the child's developmental progress while in the Brown home has been, as stated, "remarkable." Since his release from the hospital on July 14, 1989, the Browns have provided Angelo with a loving, nurturing, stable home environment, the fundamental benefit of which is evidenced by the "remarkable" progress made by this child. Under the totality of the circumstances, continuation of a permanent, loving, CT Page 6390 nurturing, stable home, in which setting the child has done so well, is in Angelo McC.'s best interests; such can be accomplished through the termination of parental rights, thereby freeing the child for adoption, and the implementation of the DCYS plan. It is hereby found, applying a clear and convincing evidence standard, that termination of parental rights to Angelo McC. is in the child's best interests.
The court has carefully considered the factors enumerated in Section 17a-1121(d)(1) through (6), and hereby finds, by clear and convincing evidence, the following:
(1) It does not appear that services were offered to respondent/mother between July 14, 1989 and April 6, 1990, the latter date being when the second social worker replied to mother's letter received on March 15, 1990; however, in her reply, the social worker sought to promptly commence communications with the respondent(s) relative to reunification. Respondent/mother did not keep the June 12, 1990 appointment to discuss reunification, and never contacted the Department again until three months later.
Although no services were put in place, it must be considered that the mother did not attend the Probate Court hearings, although urged to do so; she did not make inquiry of DCYS regarding reunification until March 1990; she lived out-of-state in motels and her whereabouts remained unknown for protracted periods of time; and, after contacting DCYS in March 1990, she failed to show up for the scheduled appointment, and did not thereafter follow through with continued communications with DCYS. Given respondent/mother's degree of contact and cooperation with DCYS, the implementation of services intended to facilitate reunification would have been most difficult.
(2) The court ordered, on petitioner's motion, a psychological evaluation of mother and child with PC, and PC with foster parents, with costs to DCYS; however, this order was entered over respondent/mother's objection (not agreed to).
No expectations were set in the Probate Court with regard to the respondent/parents (although the Probate Court order did provide for visitation by the maternal grandmother). As stated, respondent/mother did not attend the Probate Court hearings, although urged by to social worker to be present. As also stated, for prolonged periods, the mother's whereabouts were unknown. However, when the mother did write DCYS, the worker, in the phone calls which followed that contact, explained to respondent what would be expected: that she should visit the child on a reasonably regular basis, secure adequate housing, and remain in contact with the Department. Also, the mother was CT Page 6391 initially told that since no specific expectations were established in the Probate Court, a service agreement would be drawn up at the time of the scheduled appointment in Hartford setting forth in writing the precise expectations. Mother did not appear for the scheduled appointment, she did not again contact DCYS for three months, and she did not visit with the child. In all of her conversations with respondent/mother, the social worker "stressed" the importance of visitation with the child. Furthermore, there is evidence that the written treatment plans were forwarded to the mother which set out the expectations.
(3) There is no evidence of any feelings toward, or emotional ties with, respondent/parents on the part of the child. The child has strong emotional ties and feelings with respect to the Browns, who have been his continuous caretakers since July 14, 1989. The child is strongly bonded with Mr. and Mrs. Brown, and they are the child's psychological parents.
(4) Angelo McC. was born April 5, 1988; he is four years old. Considering the child's age, along with the fact that he has had no contact with his natural mother since July 1, 1989, it is the court's view that permanency, and continuation of the nurturing home he has benefited from since that date, is consistent with the child's best interests.
(5) There is little evidence that respondent/parents made any significant effort to adjust either of their circumstances, conduct, and/or conditions to make it in the best interests of the child to return to his home in the foreseeable future. However, there is some evidence that in February/March 1990 respondent/mother did obtain more appropriate housing with a view of having the child returned to her. This would seem to confirm the first social worker's testimony that in a November 1989 telephone conversation with the mother, he explained what was required. There is also evidence that the more appropriate housing was not sustained.
Respondent/parents did not maintain contact, or visit, with the child in an effort to reunite; respondent/parents did not maintain regular contact or communication with DCYS or any other custodian of the child.
(6) There is no credible evidence that respondent/parents have been prevented in any way, or by anyone, or by any circumstance, from maintaining a meaningful relationship with Angelo McC.
Petitioner has met its burden of proof by clear and convincing evidence; the best interests of Angelo McC. will be CT Page 6392 served by freeing him for adoption, and by provision of a loving, nurturing, permanent home.
It is found, by clear and convincing evidence, that termination of parental rights is in the best interest of Angelo McC.; and, that over an extended period of time which is not less than one year, statutory grounds have existed for the termination of the parental rights of each parent.
The petition to terminate the parental rights of the respondent/parents to the child Angelo McC. is hereby Granted; and the Department of Children and Youth Services is appointed Statutory Parent for the said Angelo McC.
In accordance with general Statutes Section 17a-112(i), a case plan report shall be submitted to this court by the Commissioner within ninety (90) days, and thereafter as the court may require, but no less often than annually.
MULCAHY, J.